CULP, APPELLANT, *v.* FEDERATED DEPARTMENT STORES, INC., APPELLEE.

(No. 2926—Decided December 30, 1965.)

*Mr. Harrison B. Kern* and *Mr. William H. Selva,* for appellant.

*Messrs. Harshman, Young, Colvin & Alexander,* for appellee.

KERNS, J. This is an appeal on questions of law from a judgment of the Court of Common Pleas of Montgomery County wherein a motion by the defendant for judgment notwithstanding the verdict was sustained and a verdict for the plaintiff in the sum of $30,000 was set aside.

The facts disclose that the plaintiff, James Culp, along with one William Everett, entered the defendant's store on August 17, 1960, at approximately 10:30 a. m., and proceeded to the men's clothing department. Shortly thereafter, the plaintiff left Everett and went to the record department. In the meantime, Everett attempted to purchase a number of items upon a forged signature. At or about the time the forgery was discovered, the plaintiff returned, and both he and Everett were taken by a store detective to another floor of the building.

The police were called, and in a short time two policemen came to the office of the store where Everett and the plaintiff

had been detained. Thereafter, both Everett and Culp were arrested, taken to police headquarters, photographed, fingerprinted and held in jail.

At approximately 10:30 a. m. on August 18, 1965, the plaintiff Culp, who was twenty years of age at the time, was released without charges being filed against him.

Insofar as it relates to the particular allegations upon which the claim for damages is based, the plaintiff's amended petition provides ''that at the time of this occurrence as aforesaid paintiff was suffering from a nervous condition which predisposed him to periods of anxiety and depression'' and ''that by reason of the acts and conduct of defendant's employees as herein set forth and by reason of the arrest and imprisonment by the city police plaintiff was caused to and did suffer mental anguish and pain and went into a state of emotional shock and the pre-existing condition as above stated was thereby aggravated and became progressively worse.''

The evidence discloses that the plaintiff had been under ''some degree of mental disability ever since he was six years old'' and that he had received out-patient psychiatric treatment as late as June 1960.

In October 1960, plaintiff was admitted to Dayton State Hospital where he first met Dr. M. T. Faruki who was the only witness to present expert medical testimony at the trial of the case.

With reference to the plaintiff's detention and arrest at defendant's department store and his subsequent incarceration, Dr. Faruki testified as follows:

''Now, Doctor, based on these facts, I will ask you if you have an opinion whether or not there is a causal relationship between the events and occurences which I have just described and James' condition when you examined him at the Dayton State Hospital?

''Mr. Alexander: Objection.

''The Court: Overruled.

''Mr. Kern: (continuing)

''Q. You may answer. A. When did that incident occur?

''Q. August 17, 1960 and carried over until the following day, August 18th, 1960. A. He was seen by a psychiatrist on two occasions?

"Q. Between August 18th and the admission to Dayton State Hospital. A. And the answer you want is whether or not there is any causal relationship?

"Q. First, I asked you if you have an opinion as to whether or not there is a causal relationship between the incident and any condition you observed after James Culp was under your care. A. There could possibly be.

"Q. Doctor, can you state an opinion with reasonable medical certainty? A. Yes, sir. Based on my knowledge of Mr. Culp's condition, during the earlier part, his pattern of adjustment, the findings we have on him and the type of personalty, yes.

"Q. What is your opinion? A. There could very well be a causal relationship between the sequence of events that you described and Mr. Culp's condition."

A short time later, the doctor testified further as follows:

"Q. I had asked you the effect of this incident on Mr. Culp's condition. A. Right. So therefore, in evaluating its effect, I would have to do so based on our previous knowledge of Mr. Culp's condition as well as the way he handled himself in the hospital. A good example was when we took him to the treatment room to receive a treatment, and he ran off, he ran away. His condition was characterized by inability to face the reality of the world around him and an awareness of it falling apart. I am going to conclude that the circumstances you described would have a harmful effect on Mr. Culp because of his utter helplessness, utter dependency, the completely overwhelmed state that he was in and signs of falling apart that have been previously described and therefore he would not be able to tolerate the situation in which the very thing that he is afraid of, really happens."

Then, upon cross-examination, Dr. Faruki testified further as follows:

"Q. All right, Doctor, as I understand your testimony this morning, you feel that there could possibly be a connection between the events that were related in the hypothetical question by Mr. Kern to the condition that you observed when Mr. Culp was admitted in October of 1960?

"Mr. Kerns: I object, your Honor.

"The court: Overruled.

"Witness: Could you repeat the question?

"Mr. Alexander: (to reporter) Read the question.

"Thereupon, the above question was read by the reporter.

"A. Yes, sir.

"Mr. Alexander: (continuing) Q. Now whenever we get into a hypothetical question, we get into a rather speculative area, isn't this true, Doctor. A. Yes."

Although Doctor Faruki later testified that his opinion was based upon "medical certainty," the certainty remained premised upon possibility, and the opinion itself did not develop beyond the stage of possibility. At one point, the trial court requested a clarification of the words "there could very well be," but counsel for the plaintiff did not press for nor did the doctor volunteer any answer from which it might be inferred that his opinion was based upon both a probable causal connection and reasonable medical certainty.

This is the only medical testimony in the record upon the question of causation or aggravation, and in view of substantial evidence of plaintiff's pre-existing mental condition and his long history of emotional stress, this issue presented a field of scientific inquiry where expert medical testimony was indispensable. 21 Ohio Jurisprudence 2d 501, Section 485; *Drakulich* v. *Industrial Commission*, 137 Ohio St. 82; *Stacey* v. *Carnegie-Illinois Steel Corp.*, 156 Ohio St. 205; *Tate* v. *Young, Admr.*, 111 Ohio App. 159; *Koleff* v. *United States Steel Corp.*, 105 Ohio App. 395; 20 American Jurisprudence 711, Section 850.

And the medical testimony in the present case that there "could possibly be" or "could very well be" a causal relationship between the described events and the plaintiff's subsequent condition is not of sufficient probative force to sustain an essential element of the plaintiff's case. *Brandt* v. *Mansfield Rapid Transit, Inc.*, 153 Ohio St. 429; *Drakulich* v. *Industrial Commission*, 137 Ohio St. 82. A jury's verdict may not be based solely on possibilities. *Aiken* v. *Industrial Commission*, 143 Ohio St. 113; *Hof* v. *Industrial Commission*, 62 Ohio App. 241; *Brazis* v. *National Telephone Supply Co.*, 38 Ohio Law Abs. 57.

The remaining problem in this case is essentially one of procedure. The failure of medical proof upon the question of aggravation undoubtedly eliminated what was by far the

major item of damage, and the amount of the verdict when applied to other elements of damage is clearly excessive.

However, in construing all the evidence most favorably to the plaintiff, as we must when ruling on a motion for judgment notwithstanding the verdict, it appears doubtful that aggravation was the *sole* element of damage considered by the jury in rendering its verdict.

In considering such a motion, the weight of the evidence is not involved. The well-established principles governing such a motion are discussed in *Kenny* v. *Metropolitan Life Ins. Co.*, 82 Ohio App. 51, at page 55, where the court states:

"Now what is the issue on a motion for judgment notwithstanding the verdict? It is manifest that it raises the same issue as a motion for a directed verdict made at the close of all the evidence. It is said in *J. & F. Harig Co.* v. *City of Cincinnati*, 61 Ohio App., 314, 22 N. E. (2d), 540, that it is nothing more than an iteration of that motion. And a motion for a directed verdict is 'in the nature of a demurrer to the evidence' and 'involves, for its purposes, an admission or assumption of the truth of the evidence supporting the facts essential to the claim of the party against whom the motion is directed, as well as an admission of all the facts which the evidence proves or tends to prove or support and all reasonable inferences which a jury might draw therefrom.' 39 Ohio Jurisprudence, 799, 800.''

Governed by the foregoing principles, and in view of sufficient evidence of some damage other than the element of damage requiring medical proof, we are of the opinion that the only proper course available to the trial court was to sustain the defendant's motion for a new trial.

Accordingly, the judgment of the trial court sustaining the motion for judgment notwithstanding the verdict will be reversed, and the cause remanded for a new trial.

*Judgment reversed.*

SHERER, P. J., and CRAWFORD, J., concur.